[No. B010291. Second Dist., Div. Three. Oct. 22, 1985.]

EL CAMINO COMMUNITY COLLEGE DISTRICT, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
INFORMATION ASSOCIATES, INC., Real Party in Interest.

608

**COUNSEL**

Parker & Covert, Spencer E. Covert, Jr., P. Addison Covert and Wendy H. Wiles for Petitioner.

No appearance for Respondent.

Gipson Hoffman & Pancione, Kenneth I. Sidle, Jonathan J. Panzer, Lowell C. Brown and Sheila L. Sparks for Real Party in Interest.

**OPINION**

**LUI, J.**—El Camino Community College District (district) seeks a peremptory writ of mandate which would compel the superior court to vacate its order requiring arbitration of the district's contract dispute with Information Associates (IA) in Rochester, New York. We grant the district's petition.

### PROCEDURAL BACKGROUND

On August 10, 1984, the district filed its complaint against IA alleging breach of contract and fraud. IA responded with a notice of hearing and a petition to compel arbitration, filed November 5, 1984. On November 13, 1984, the district filed its opposition to the petition to compel arbitration.

The matter was called for hearing and argued in the superior court on November 20, 1984. The court granted IA's petition, but reserved decision on the question of where arbitration was to take place.

Both parties submitted additional points and authorities on the issue, and on December 6, 1984, the court rendered its decision ordering the arbitra-

tion to take place in Rochester, New York. In the minute order of December 6, the trial court indicated its reliance on *Smith, Valentino & Smith, Inc.* v. *Superior Court* (1976) 17 Cal.3d 491, 494 [131 Cal.Rptr. 374, 551 P.2d 1206] [holding "that forum selection clauses will be given effect unless . . . enforcement would be unreasonable"] and *The Bremen* v. *Zapata Off-Shore Co.* (1972) 407 U.S. 1 [32 L.Ed.2d 513, 92 S.Ct. 1907], in ordering the arbitration to proceed in New York.

On January 22, 1985, the district filed its petition for writ of mandate in this court seeking relief from the order of the superior court directing arbitration. We denied the petition on February 22, 1985.

Thereafter, the district sought review in the Supreme Court in a petition filed March 4, 1985. The Supreme Court granted hearing and retransferred the matter to this court with directions for us to issue an alternative writ. Pursuant to our Supreme Court's directions, we issued an alternative writ on July 5, 1985.[1]

FACTUAL BACKGROUND

In July 1980, the district's board of trustees authorized the district to advertise an invitation to bid on a personnel/payroll computer software system which would be compatible with the district's computer hardware already in place. The notice inviting bids was scheduled to be published July 28, 1980, and August 4, 1980. The district's bid packet available to bidders contained four items: an invitation to bid, information to bidders, general conditions, and specifications. All bids were to be received by August 13, 1980.

IA's bid pursuant to the invitation was the only response by a potential vendor; it did not contain any provision for arbitration of disputes. IA's bid was accepted by the board of trustees, and the contract was awarded to IA on September 3, 1980.[2]

Subsequently, on September 29, 1980, IA sent the district a document to be signed by the district entitled "IAI License Agreement." The cover letter explaining the purpose of the license agreement made no reference to an

---

[1]By granting the alternative writ, we have determined that no adequate remedy exists at law. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 478 [91 Cal.Rptr. 23, 476 P.2d 423].)

[2]Pursuant to rule 12(a) of the California Rules of Court, we have augmented the record to include the original superior court file.

arbitration clause.[3] The license agreement was signed by a vice president of the district on October 2, 1980. On July 8, 1981, another vice president of the district signed another document sent by IA to the district entitled "IA Systems and Programming Agreement." (The two documents shall be referred to collectively as the agreements.)

On the back of each agreement was a printed form with numbered items setting forth each party's rights and liabilities with respect to the particular agreement. Item number 7 on the systems and programming agreement and item number 9 on the license agreement were paragraphs entitled "Arbitration." The paragraphs on each form were substantially similar, and provided: "Any controversy arising from or relating to this Agreement or the breach thereof will be settled by arbitration in accordance with the rules of the American Arbitration Association at Rochester, New York, and judgment upon the award rendered may be entered into any court having jurisdiction thereunder."

Thereafter, the district filed an action against IA in the Los Angeles Superior Court for breach of the underlying contract, alleging that IA never provided the district with a computer software system conforming to the specifications set forth in the bid packet.

## CONTENTIONS

■■■ The district's sole contention is that because its board of trustees did not approve or ratify the agreements in accordance with the requirements of Education Code[4] section 81655, the district is not bound by the arbitration clauses contained in those agreements.

■■■ IA, in turn, maintains that the district should be estopped from invoking the provisions of section 81655 to repudiate the agreements since none of the public policy considerations against applying estoppel to a public entity are present in this case.

---

[3]The cover letter explained: "As is standard within the computer software industry, the product is not sold, it is licensed. In other words, it remains the property of the vendor; therefore, the vendor must set certain limits on the use of the product. Consequently, enclosed is the license agreement that serves to protect our ownership while the system resides with and is in use by our customers."

[4]Unless otherwise indicated, all statutory references are to the Education Code.

DISCUSSION

I

*Pursuant to Section 81655, the Agreements Do Not Constitute Enforceable Obligations Against the District*

■ IA contends that the agreements containing the arbitration clauses were valid contracts freely entered into by the district through its representatives, and should be enforced notwithstanding the board's failure to ratify them pursuant to section 81655. We disagree.

"A public school district is a public entity with limited powers. 'A board of school trustees is an administrative agency created by statute and invested only with the powers expressly conferred by the Legislature [citation] and cannot exceed the powers granted to [it].' (*Patterson* v. *Board of Trustees* [1958] 157 Cal.App.2d 811, 818 . . . .) 'Where the statute prescribes the only mode by which the power to contract shall be exercised the *mode* is the *measure* of the power.' (*Reams* v. *Cooley* [1915] 171 Cal. 150, 154 . . . .)" (*Uhlmann* v. *Alhambra, etc. School Dist.* (1963) 221 Cal.App.2d 228, 234 [34 Cal.Rptr. 341], italics in original.)

The delegation of powers to agents by a school district's governing board and the authority of such agents to bind the governing board are set out in section 81655. That section provides in relevant part: "Wherever in this code the power to contract is invested in the governing board of the community college district or any member thereof, such power may by a majority vote of the board be delegated to its district superintendent, or to such persons as he may designate, or if there be no district superintendent then to such other officer or employee of the district as the board may designate. Such delegation of power may be limited as to time, money or subject matter or may be a blanket authorization in advance of its exercise, all as the governing board may direct; provided, however, that no contract made pursuant to such delegation and authorization shall be valid or constitute an enforceable obligation against the district unless and until the same shall have been approved or ratified by the governing board, said approval or ratification to be evidenced by a motion of said board duly passed and adopted. . . ."

In the instant case, the agreements were signed by two vice presidents of the district, but they were never approved or ratified by the board of trustees. Under section 81655, the agreements do not constitute enforceable ob-

ligations against the district. Thus, the arbitration clauses do not govern this dispute.

## II

*Estoppel Will Not Apply to Prevent the District From Invoking Education Code Section 81655 and Thereby Repudiating the Agreements*

■ IA maintains that the district should be estopped from invoking section 81655 and thus repudiating the agreements. In support of this contention, IA relies on the 1970 California Supreme Court case of *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462 (*Mansell*), and distinguishes an appellate court decision decided several months before *Mansell, Santa Monica Unified Sch. Dist.* v. *Persh* (1970) 5 Cal.App.3d 945 [85 Cal.Rptr. 463] (*Persh*). In distinguishing *Persh,* IA argues that the public policy considerations which impressed the *Persh* court are not presented in the case at bar. We disagree and find IA's reliance on *Mansell* to be misplaced. *Persh,* in our view, is dispositive of the estoppel issue raised by IA.

■ We first note that IA fails to meet the requirements for a party asserting estoppel. ■ "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].)

■ Even assuming IA meets the first two and the last elements, it falls short of meeting the third. IA contends it had no knowledge of the limitations on the authority of the two representatives of the district to bind the district in contract, and it had no reasonable means of so informing itself. This contention is without merit.

It is well settled that "[p]ersons dealing with a school district are chargeable with notice of limitations on its power to contract." (*Persh, supra,* 5 Cal.App.3d at p. 952; *Seymour* v. *State of California* (1984) 156 Cal.App.3d 200 [201 Cal.Rptr. 15].) Thus, IA had constructive, if not actual, notice of the limitations on the officers' authority to bind the district

to the terms of the agreements. ■ It is the burden of the party asserting estoppel to prove all of its requisite elements, and the doctrine is strictly applied and must be substantiated in every particular. (*Bear Creek Co.* v. *James* (1953) 115 Cal.App.2d 725, 732 [252 P.2d 723].)

Since IA fails to meet the requirements for asserting the doctrine of estoppel, its argument that the district should be estopped from invoking the provisions of section 81655 to repudiate the agreements must fall.

We also find *Mansell* inapposite to the instant case. *Mansell* presented a unique factual situation in which the City of Long Beach in an original proceeding before the Supreme Court sought a peremptory writ of mandate to compel its city manager and city clerk to execute and put into effect certain agreements intended to resolve complex title and boundary problems with respect to tidelands in the Alamitos Bay area. In the face of title problems and potential boundary disputes which involved a total of 502 parcels (39.9 acres) and could have affected virtually all of the Alamitos Bay area with a population of 19,000 (*Mansell, supra*, 3 Cal.3d at p. 470), the City of Long Beach and the State of California sought a legislative alternative to a quiet title action. The solution required legislation to put into effect agreements which "(1) settle[d] the boundaries of public trust lands, (2) quitclaim[ed] public claims in subdivided and settled areas, and (3) exchange[d] certain trust lands for certain nearby private lands." (*Mansell, supra*, at p. 473.) The city clerk and city manager then refused to execute the agreements on constitutional grounds.

The city contended, inter alia, that the city and state should be estopped from asserting a claim of paramount title where the subject lands had been filled and improved with the knowledge and acquiescence of the city and state, and the city and state which were aware of the title problems conducted themselves as though no title problems existed.

Observing first the "peculiar context" in which the estoppel argument was being raised, i.e., the city was attempting to estop itself as to a matter which was properly the subject of another action, the court addressed the estoppel issue in light of the unusual circumstances presented involving disputes over the title to land. ■ The court then considered the application of estoppel against a government entity and noted that: "It is settled that '[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. (*United States Fid. & Guar. Co.* v. *State Board of Equalization* (1956) 47 Cal.2d 384, 388-389 [303 P.2d 1034] and cases there collected.)' (*Driscoll* v. *City of Los Angeles* [1967] 67 Cal.2d 297, 306 [61 Cal.Rptr. 661, 431 P.2d 245].) (See generally 28

Am.Jur.2d, Estoppel and Waiver, §§ 122-133, pp. 782-802; 31 C.J.S., Estoppel, §§ 138-147, pp. 675-733.) Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' (*County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829-830 [186 P.2d 124, 175 A.L.R. 747], see also cases there cited.) The tension between these twin principles makes up the doctrinal context in which concrete cases are decided." (*Mansell, supra,* at p. 493.)

Following a detailed examination of the case law on the issue of the application of estoppel against a governmental entity, the court declared: "we have concluded that the proper rule governing equitable estoppel against the government is the following: The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Mansell, supra,* at pp. 496-497.)

The court then concluded that on the facts before it, "the great injustice which would result in this case from the failure to uphold an equitable estoppel against the state and city justifies the minimal effect upon public policy which would result from the raising of such an estoppel—and therefore that this is one of those 'exceptional cases' where 'justice and right require' that the government be bound by an equitable estoppel." (*Mansell, supra,* at p. 501.)

In our view, *Mansell* presented a factual situation which differed so sharply from the circumstances presented in the case at bar as to render it inapplicable to the present case except in the most general sense. As the *Mansell* court itself noted, "the *rare* combination of government conduct and extensive reliance here involved will create an extremely narrow precedent for application in future cases." (*Mansell, supra,* at p. 500, italics added.) Moreover, the *Mansell* case involved "thousands of homeowners who, through the long continuing conduct of the government entities involved, have been led to believe and have acted upon the belief that the lands upon which they reside are their own private properties. Because similarly compelling circumstances will not often recur, the public policy expressed in article XV, section 3, of the Constitution will not suffer substantial erosion as a result of the decision we reach today." (*Ibid.*)

The unusual and compelling considerations involved in *Mansell* do not support the application of equitable estoppel against the district under the facts presented here. Rather, it appears that *Persh* is dispositive of the issues presented in this case.

In *Persh,* the Santa Monica Unified School District appealed from a judgment and decree of specific performance requiring the district to purchase certain real property from defendants. The district's governing board passed a formal resolution of necessity authorizing the initiation of a condemnation action of the defendants' property in January 1967 after negotiations for that property had begun. The district's governing board later passed a formal resolution authorizing offers for the purchase of the property to be made to defendants. A week later, the district filed an action to condemn the property. The supervisor of building and planning for the district then communicated by letter to defendants an offer of $345,000 for the property to avoid the necessity of a condemnation action. Defendants made several counteroffers, only one of which was communicated to the board and rejected. The $345,000 offer was renewed, and the trial court found that defendants had accepted that offer.

Thereafter, defendant Persh incurred a total indebtedness of over $56,000 in purchasing other real estate to avoid the income tax consequences of a sale of the property to the district, assuming he would discharge this indebtedness from the proceeds from the sale of the property. In August 1967, however, the district's governing board passed a resolution abandoning the eminent domain proceedings, which defendants were unsuccessful in attempting to set aside. The trial court found the contract was enforceable against the district; the appellate court reversed this finding.

Concluding that the district was not bound by the two resolutions or by a contract which arose from defendant Persh's acceptance of the district's offer, the court examined the requirements of sections 1002.5 (requiring affirmance of any official action of a school district by a formal vote of the district's governing board) and 15961 (now §§ 81655 and 39656 respectively). The court declared: "A contract which has not been approved or ratified pursuant to Education Code section 15961 does not comply with the required formalities, and is unenforceable against the District." (*Persh, supra,* 5 Cal.App.3d at p. 952.) The court then noted the requirements of section 1002.5, and concluded, "[i]f the cited sections of the Education Code demonstrate anything, they demonstrate a legislative intention that such major decisions of school boards as the purchase of school sites should be open and subject to public scrutiny." (*Persh, supra,* at p. 953.) The court found that estoppel was unavailable to Persh despite the undeniable harm

he suffered as a result of reliance on the school district's representations. ■ The doctrine of equitable estoppel, the court observed, "is not applicable to a municipal agency which has not acted in compliance with a statute which is the measure of its power." (*Ibid.*)

■ IA attempts to distinguish the *Persh* case on the ground that the basis for the *Persh* decision was a strong public policy interest in forcing the major decisions of public school districts to be made in the open and subject to public scrutiny. IA maintains that no such policy interest is at stake in the case at bar. We disagree.

■ While arbitration is a highly favored means of dispute resolution (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 706 [131 Cal.Rptr. 882, 552 P.2d 1178]), "[i]t is said on high authority that the right to select a judicial forum, vis-à-vis arbitration, is a '"substantial right,"'" not lightly to be deemed waived." (*Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 31 [136 Cal.Rptr. 378].) Further, it is well settled that the forfeiture of the right to a judicial forum must be expressly agreed upon. "'"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."'" (*Atkinson* v. *Sinclair Refining Co.* (1962) 370 U.S. 238, 241 . . .; *United Concrete Pipe Corp.* v. *Laborers' Local No. 89* (1964) 231 Cal.App.2d 315, 318 . . . .)" (*Id.*, at p. 32.)

■ It follows that an addition of an arbitration clause to the terms of a contract (whether that addition be by way of a new contract or agreement, or by a modification of the original contract) is a significant alteration of the rights of each party to the contract, and goes to the heart of the parties' agreement. In our estimate, an arbitration clause is a material element of a contract, and no less important in terms of the public's interest in having a school district's contract be subject to public scrutiny than contracts involving the expenditure of funds to purchase land as in *Persh*. In either case, public monies are at stake, and the same public policy considerations apply.

Finally, it is worth noting that no court has expressly invoked the principles of estoppel to contravene directly or indirectly any statutory or constitutional limitations. (See *Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 28 [157 Cal.Rptr. 706, 598 P.2d 866].) *Persh,* in our view, is directly on point in this case, and dispositive of IA's estoppel argument.

## DISPOSITION

Let a peremptory writ of mandate issue compelling the superior court to vacate its order of December 6, 1984, requiring arbitration of the parties' dispute in Rochester, New York.

Klein, P. J., and Danielson, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied January 15, 1986.